Filed 3/11/22  In re B.K. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.K. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br>v.<br><br>    C.C. et al.<br><br>    Defendants and Appellants. | A162299<br><br>(Humboldt County Super. Ct. Nos. JV2000158, JV2000159, JV2000160) |

Mother C.C. and father D.A. appeal the juvenile court's jurisdictional finding that they placed the children at risk of serious physical harm by repeatedly engaging in domestic violence in their home in the fall of 2020 while the children were present in the home.  (Welf. & Inst. Code, § 300, subd. (b).)  The parents assert that the petition failed to state a prima facie case for relief and that the juvenile court therefore erred when it denied mother's motion akin to a demurrer.  The parents also argue that the juvenile court's jurisdictional findings are not supported by substantial evidence.  The parents urge this court to reverse the juvenile court's dispositional order

1

declaring the children dependents of the juvenile court and ordering the parents to engage in family maintenance services.

Respondent Humboldt County Department of Social Services (Department) asked this court to take judicial notice that the juvenile court terminated jurisdiction over the children and dismissed the dependency cases while the parents' appeals were pending. The Department argues that the appeals must be dismissed as moot. The parents oppose dismissal, arguing that the matter is not moot because the parents have suffered, and may continue to suffer, collateral consequences from the juvenile court's findings. We agree with the Department that dismissal is appropriate under the circumstances presented in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Department Files Non-Detained Petitions Alleging That Children Are At-Risk Due to Parents' Domestic Violence

On November 9, 2020, the Department filed dependency petitions regarding B.K., R.R., and M.A., which contained a single allegation under Welfare and Institutions Code section 300, subdivision (b), that the parents had placed the children at risk of serious physical harm due to the parents' failure to protect the children, or alternatively, because of the inability of the parents to provide regular care due to the parents' mental illness, developmental disability, or substance abuse:

"b-1. [Father] and [mother] engage in domestic violence in the home where [B.K.] and his half siblings live. After the birth of [M.A.] in 2019, the mother was observed to have two black eyes and on 09/10/2020, the mother reported that [father] left a visible mark on the underside of her chin and spat on her three times. [Father] broke her phone and damaged her windshield. The mother has failed to protect [B.K.], [M.A.], and [R.R.] from

the actions of the father. The presence of physical domestic violence in the home places [the children] at risk of physical harm."

The Department did not remove any of the children from parental custody. In its court report in support of the non-detained petitions, the Department summarized the evidence of domestic violence, which the Department believed placed the children at risk.[1]

On September 10, 2020, mother reported to the Humboldt County Sheriff's Office that father had verbally and physically assaulted her at home while the children were in another room. Father allegedly yelled at mother, spit on her several times, and hit her under the chin to force her to look up at him, leaving a scratch on her neck. Father punched a hole in the wall, then, as mother attempted to photograph the damage, smashed the mother's phone, stomped on a guitar, and broke the windshield of mother's car. Mother later wanted to redact her statement. Based on prior domestic violence referrals, the Department believed that mother minimized the severity of intimate partner violence and that she would not cooperate with law enforcement.

On September 23, 2020, mother called Sheriff's deputies to report that father had hit her in the face and left. Mother was shaking and upset when law enforcement arrived and the lower left side of her lip was red and swollen. She said that father had called her a "dirty bitch" and spit on her. When mother removed the shirt that father had spit on, father grabbed the shirt, twisting mother's finger in the process. Mother said that the children did not see the altercation because it happened in the living room and the

---

[1] The evidentiary reports filed by the Department in B.K.'s case and in R.R. and M.A.'s case are almost identical. Citations are to the reports filed in R.R. and M.A.'s case.

children were in their bedrooms.  Mother said that father had hit her many times in the past, but she did not report it.  Mother declined an emergency protective order (EPO) on September 23, 2020, because she had already applied for a restraining order.  Mother told the deputies that she and father broke up in 2017, but he came to her home daily to see the children, showing up whenever he felt like it.

On September 25, 2020, two Department social workers made an unannounced visit to the family home.  When father came outside to speak with the social workers, he denied engaging in domestic violence with mother.  The social workers saw B.K. and R.R. playing in the yard and asked to speak with them.  Father told the children "this is who he had warned the children about," adding that the children should not speak to the social workers because they "were the people who were going to hurt their family." The children appeared happy and comfortable in father's presence.

Social Worker Bartosch spoke to the mother by phone on September 28, 2020.  Mother said that the children were unaware of the domestic violence incident that occurred on September 10, 2020, because they were in another room doing yoga.  Mother minimized the September 10 incident and said that father had not meant to hurt her.  Mother also told Bartosch that she was involved in a domestic violence incident earlier in the day on September 28, when father had yelled at her and spit on her because he was angry that she had called law enforcement.  Mother did not think that the children had seen or heard anything because they were in the living room and the altercation occurred in the bathroom.

When law enforcement responded to the family home on September 28, mother told them that father had intentionally spit on her five times and thrown a ball at her face the previous day because he was angry that

4

Department social workers had visited the home. Father was arrested and served with a temporary restraining order, which mother had obtained on September 8, 2020.[2]

Mother brought all three children to the park for a meeting with Bartosch on October 13, 2020. The children were in good spirits and free from injury. Mother recanted many of her previous statements about the September 10, 2020 domestic violence incident. Mother told the social worker that the district attorney decided not to file charges against father after mother told him that she "had lied and/or exaggerated the things she reported about [father] because she was mad at him." Mother had dropped her application for a restraining order because she did not feel she needed it. Mother said that father was staying with a friend and coming to her home to see the children and this was working well. Bartosch gave mother referrals for behavioral health counseling and domestic violence resources despite mother's protest that neither she nor father needed domestic violence or anger management services. Bartosch tried, unsuccessfully, to speak to R.R. B.K. told Bartosch that he lived full time with mother and father, who he thought of as a father, and that "his house was happy and he did not have any worries." B.K. said that father was nice to the children.

Also on October 13, 2020, Bartosch had a telephone conversation with a friend of mother's. Mother's friend said she had dated father 9 to 10 years ago "and he was just as abusive as always." The friend said that mother was

_____

[2] Mother told Bartosch that she had not listed the children as protected parties on her application for a DVRO "she did not have worries about [father] and the children." Despite mother's statement to the social worker, the temporary restraining order contains a preliminary finding that father may present a child abduction risk and orders that father would have no visitation with R.R. and M.A. pending the hearing on mother's application for a DVRO.

5

isolated and that father smashed mother's laptop or phone to restrict mother's ability to talk to other people. She said that mother told her that father beats her in front of the children. Mother's friend said that she had seen mother apply make-up in an attempt to cover up a black eye. When the youngest child was born, father allegedly forced mother to leave the hospital early so that people would not ask questions about her black eye. "One time the friend called [Child Welfare Services] and [father] called her and said 'you're gonna call on us?' That is why she has two black eyes." Mother's friend thought that father treated B.K. worse than he treated the girls. She said that father was not allowed to visit a child of his who lives in Pennsylvania because he had badly beaten that child's mother.

The Department's investigation uncovered six prior referrals regarding mother and/or father, four of which had been investigated.

On August 1, 2017, the Department received a referral which alleged general neglect of B.K. and general neglect and physical abuse of R.R. It was alleged that mother used boiling hot water to ritually cleanse baby R.R., causing her to scream in pain. Mother explained that although the bath water had been boiled, it was used warm and did not cause pain. R.R. had no visible injuries. B.K. told the social worker that mother and father popped him in the mouth when he was in trouble. The Department examined the children's medical records from a visit to the emergency room at Mad River Hospital and did not discover any suspicious medical issues for either child. The referral was deemed unfounded as to B.K. and inconclusive as to R.R.

On August 13, 2018, the Department received a referral which alleged that father yelled at B.K. and "whooped" him, and that B.K. and R.R. appeared "fixated on food." It was difficult for the sheriff and the Department to make contact with the family. Mother refused to allow the

6

social worker to interview the children despite the social worker presenting a warrant. Neither child appeared to be underweight. The allegations were deemed inconclusive.

On March 26, 2019, the Department received a referral alleging general neglect of B.K. shortly after the birth of M.A. Mother had two black eyes; she told the reporting party that she was holding the baby when she received the injury. B.K. allegedly had marks on his face as a result of being hit by father. On March 25, 2019, a friend of mother's had asked the sheriff's office to conduct a welfare check because mother had a black eye and was texting "erratic, nonsensical statements," and when the friend tried to call mother a male answered, yelling nonsensical statements. Representatives of the Humboldt County Sheriff's Department told the Department that officers "had gone to the home and that everything was fine and the social worker [should] not to go to the home." The allegations were deemed inconclusive because the social worker was unable to meet with the family.

The fourth referral which was investigated was the September 10, 2020 domestic violence incident described above. The allegations were deemed inconclusive.

The Department filed an addendum on December 1, 2020, which documented the increasingly hostile communications between the parents and the Department. On November 16, 2020, mother accused Bartosch of being corrupt, lying, and "trying to exploit my family for money for the state." Mother said that she had lost her job as a behavioral aide because the Department had opened a child welfare case. She told Bartosch that the case was "bogus," and that she was a good mother and the kids were safe. After apparently receiving and reviewing the Department's initial court report, mother called Bartosch to say that her friend Christine was biased and

unreliable, and that information provided by Christine should not be part of the court report. According to mother, Christine made a false referral about mother having a black eye around the time of M.A.'s birth because Christine was jealous that mother had a baby. Mother told the social worker that father "has been wonderful with the kids and would never hurt them." She suggested that the Department's allegations may have been racially motivated because father is Black.

The addendum also included evidence of the Department's contacts with community members familiar with the family. R.R.'s Head Start worker told Bartosch that mother and the younger children had regularly attended playgroups since 2019. The Head Start worker had observed the children when she dropped off activity packets at the home and heard the children laughing and playing in the background when she called mother on the phone. The Head Start worker "has had no concerns for the children's safety in the home." Bartosch also spoke to a representative of the Family Resource Center in Manila who had regularly interacted with the family at play groups and day camp. The representative described mother as "super helpful and involved," and said she "did not have any worries for the children or the mother." Finally, a family friend told the social worker that in the two and one-half years she had known the family, she had observed "nothing but positive interactions between [father] and the family," and that "she absolutely did not have any worries for the children's or the mother's safety."

### Summary of Juvenile Court Proceedings
### Prior to Jurisdiction Hearing

Mother was present at the initial hearing on December 1, 2020. The juvenile court appointed counsel for the mother, father, and the children, and ordered that the children remain in the care of mother and father. The parents denied the allegation in the petition and requested that a jurisdiction

8

hearing be set without a time waiver. The court set the jurisdiction hearing for December 28, 2020.

On December 17, 2020, mother filed a motion akin to a demurrer which alleged that the petition was facially insufficient because (1) the petition did not allege that the children were present during any alleged instance of domestic violence, (2) the alleged perpetrator, father, does not reside in the home with the children, and (3) "the children are reported as being healthy and happy." At the pretrial conference on December 17, 2020, mother requested a continuance of the jurisdiction hearing. The court agreed to re-set the jurisdiction hearing when the matter was called on December 28, 2020.

Mother's motion akin to a demurrer was heard on December 30, 2020.[3] Mother's attorney argued that the petition lacked specificity, was based, in part, on hearsay from an unknown declarant, and, because it did not state the dates of prior domestic violence incidents, "is basically making it difficult for mother to assert her rights in the case and know what . . . she needs to answer." Counsel for the children agreed that "the petitions could be drafted a little bit better with dates and more specificity." Mother asked the court to dismiss the petition. Father joined in mother's request to dismiss the petition.[4]

---

[3] Mother was not present when the case was called on December 28, 2020. The court continued the hearing to December 30, 2020, at mother's request. Mother was present for the argument on December 30, 2020.

[4] Through his court-appointed attorney, father also objected to the juvenile court appointing counsel for him and asked to be allowed to represent himself. Following the jurisdiction hearing, the juvenile court denied father's request to represent himself. This issue has not been raised on appeal.

9

The Department objected that mother's motion was untimely or waived because mother had entered a denial of the allegations at the initial hearing. The Department asked the court to review the cases cited in its pretrial statement, which upheld a juvenile court taking jurisdiction based on domestic violence in a child's household even if the child had not been physically present when the domestic violence occurred. The Department further noted that it had submitted evidence in its jurisdiction report, which "do[es] provide a time frame" for prior incidents of domestic violence. The Department indicated that it could not verify mother's statement that father did not reside in the same home as mother and the children: "I don't know if he's in the house now. The one time that the social workers attempted to see the children, they had to bring the sheriffs to the home because mother would not allow them access and father was in the family home at that time." Finally, the Department expressed concern about mother's ability to protect the children from future incidents of domestic violence, noting that there had been a prior criminal case based on domestic violence, and that mother had recently filed, then withdrawn, an application for a DVRO.

The court overruled the Department's objection to the timeliness of mother's motion. Finding that the petitions "adequately state a cause of action," the court denied mother's motion akin to a demurrer. The court re-set the jurisdiction hearing for February 5, 2021.

10

## The Jurisdiction and Disposition Hearings

On February 5, 2021, the Department filed its jurisdiction report setting forth the evidence which supported the petitions.[5] The evidence initially submitted in support of the non-detained petition was augmented with the additional evidence discussed below.

The Department summarized mother and father's criminal histories. Mother had two arrests in 2019 for traffic infractions and resisting an officer, but no convictions. Father had an extensive history of misdemeanor arrests between 1996 and 2020. Father had been arrested multiple times on charges of public intoxication and driving under the influence; he was convicted of driving under the influence of alcohol in 2005. Father was arrested in 2013, 2018, and 2020 on domestic violence charges. He was convicted of misdemeanor spousal battery (Pen. Code, § 243, subd. (e)(1))[6] in 2018.

Additionally, the Department summarized Social Worker Winston's introduction as the family's ongoing social worker and described her efforts to meet with the family. Winston attempted to call mother, but she did not answer. Mother sent Winston a text message denying the social worker's request to see the children during a home visit because mother was "enforcing [her] right to privacy and due process." Winston thereafter obtained a warrant which authorized her to enter the home. Despite being shown the signed warrant on December 9, 2020, mother told the social workers and sheriff's deputies that they could not enter the home unless they removed their shoes and agreed to be filmed. After the social workers

---

[5] Although the report was filed on the day of the jurisdiction hearing, the record reflects that it was served on mother, father, their respective attorneys, and the children's attorney on December 16, 2021.

[6] Further statutory references will be to the Penal Code except as otherwise indicated.

declined to remove their shoes or submit to videorecording, mother allowed them to view B.K. and R.R. and parts of the home by opening the door and windows. The children, who were playing with toys in the living room, appeared clean and had no visible marks or bruises. The living room, kitchen, and children's bedroom appeared to be clean. When the social workers asked to speak with father, mother said she thought he had been at the home, but was no longer present. Mother declined to provide any other mailing address for father.

The Department attached copies of Humboldt County Sheriff's Department reports pertaining to its investigation of the following domestic violence incidents: September 10, 2020, September 23, 2020, and September 27 and 28, 2020. Additionally, the Department attached the sheriff's documentation of a 911 hang up call from the home on December 1, 2020, in which a male could be heard yelling at a female while a child was crying.

Neither parent attended the jurisdiction hearing on February 5, 2021. Mother's oral motion to continue was denied for failure to state good cause. The court received the Department's jurisdiction report and the sheriff's report dated March 28, 2019, which was offered by father. The juvenile court amended the sole allegation of the petitions to strike the reference to mother having two black eyes shortly after the birth of M.A. in 2019, and sustained the allegation as amended. While acknowledging that the family has "a number of strengths that are identified . . . in the jurisdictional report" the juvenile court found that "absolutely, the court has grounds to establish jurisdiction."

The parents did not attend the disposition hearing noticed for March 4, 2021. The children's attorney told the court that "[t]hese parents will not allow me to see these children, nor will they bring them in for me to visit with

these children[.]"  The court continued the disposition hearing on its own motion to March 23, 2021, to allow the children's attorney to meet with her clients.

Neither parent attended the continued disposition hearing on March 23, 2021.  The court received the disposition report.  The Department described the parents as an intact couple, but was unaware if father was living in the home at the time of disposition.  The Department's evidence established that the parents continued to resist the social workers' efforts to engage the family.[7]  Through counsel, mother and father objected to the court taking jurisdiction and to the Department's recommendation that the parents participate in family maintenance services.  The juvenile court declared the children dependents and adopted the Department's recommendation for family maintenance services.[8]

Mother filed a timely notice of appeal from the disposition orders on March 24, 2021.  Father filed a timely notice of appeal from the disposition orders on April 6, 2021.

### The Department Requests Judicial Notice That the Dependency Court Has Terminated Jurisdiction Over the Children

On December 21, 2021, the Department filed a request for judicial notice of the juvenile court's decision to terminate jurisdiction at the six-month review of family maintenance on September 23, 2021.  The

---

[7] The Department considered offering voluntary services, but rejected that option due to the parents' unwillingness to engage with the social worker.  The Department also considered withdrawing the petition, but decided that this would place the children at continued risk of exposure to domestic violence in the home and subject them to a "substantial risk of serious emotional harm[.]"

[8] The juvenile court's written disposition orders are not part of the record on appeal.

Department concurrently filed its respondent's brief, which requested that the parents' appeals be dismissed as moot. This court granted the request for judicial notice on January 10, 2022.

At the six-month review, the juvenile court found that neither parent had complied with their respective case plan, and that the parents had made "no progress" towards alleviating or mitigating the causes which necessitated the juvenile court's intervention. Nevertheless, the court found by a preponderance of the evidence that the conditions which justified initial assumption of jurisdiction under Welfare and Institutions Code section 300 no longer existed and were not likely to exist if supervision was withdrawn. The orders terminating the dependency cases were filed on September 29, 2021.[9]

## DISCUSSION

" '[A]n action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions become moot by subsequent acts or events. A reversal in such a case would be without practical effect, and the appeal will therefore be dismissed.' " (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404–405.) Generally, termination of juvenile court jurisdiction "renders an appeal from a previous order in the dependency proceedings moot." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) "However, dismissal for mootness in such circumstances is not automatic, but must be decided on a case-by-case basis." (*Ibid*; *In re Emily L.* (2021) 73 Cal.App.5th 1, 13–14.) "[T]he critical factor in considering whether a

_____

[9] The request for judicial notice did not include a "Final Juvenile Custody Order" or "JV-200" for any of the children. The parties' argument assumes, as we will also assume, that B.K. remained in mother's sole custody, while R.R. and M.A. remained in the joint custody of mother and father.

14

dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60; see also *In re Michelle M.* (1992) 8 Cal.App.4th 326, 328–329.)

An appellate court "may exercise its inherent discretion to resolve an issue when there remain 'material questions for the court's determination' [citation], where a 'pending case poses an issue of broad public interest that is likely to recur' [citation], or where 'there is a likelihood of recurrence of the controversy between the same parties or others.' " (*In re N.S., supra,* 245 Cal.App.4th at p. 59.) The party seeking such discretionary review must demonstrate the legal or practical consequences that will result from the jurisdictional findings they seek to reverse. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1493.) The parents offer several reasons why they believe that their appeals should not be dismissed as moot.

First, the parents assert that because the dismissal of a dependency appeal operates as an affirmance of the underlying findings and orders (*In re C.C., supra,* 172 Cal.App.4th at p. 1489), it would be unfair to deprive them of the opportunity on appeal "to clear their names and remove the stigma." Mother argues that she "disagreed with the contentions that she engaged in domestic violence and that there was physical domestic violence in the home which placed the children at risk of physical harm," and is "distressed" by the juvenile court's findings. Mother's desire to be vindicated on appeal is not a sufficient reason to proceed with an appeal that has been rendered moot. The proper place to contest the jurisdictional and dispositional findings was in the juvenile court. Neither of the parents appeared at the jurisdiction or disposition hearing. The juvenile court noted at jurisdiction that the parents' absence was "unfortunate," and suggested that had the parents been present to present their side of the case "it might have been that the family is

15

addressing the issue enough on a . . . level that the court would think that jurisdiction wasn't necessary[.]"

Second, the parents worry that the juvenile court's findings could be used against them in future hearings in family court or a future dependency case. In *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548, for example, the appellate court decided to hear father's appeal of jurisdictional findings that he had sexually abused his daughter, notwithstanding the termination of the dependency proceedings, because those findings were the basis of restrictive custody and visitation orders that continued to negatively affect the father. (See also *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431–1432.) This case is distinguishable because "the dismissal order here was *favorable* to [the parents] and does not form the basis of any adverse custody ruling." (*In re N.S., supra,* 245 Cal.App.4th at p. 61.) Speculation about the possible use of the juvenile court's findings in a future dependency or family law case is an insufficient ground to continue with an appeal of the juvenile court's jurisdictional or dispositional findings and orders once the juvenile court has terminated jurisdiction. (See, e.g., *In re. I.A., supra,* 201 Cal.App.4th at p. 1493; *In re N.S.,* at p. 62 ["We see no reason to review the juvenile court's jurisdictional findings here on the basis of such speculation or caution"].)

Third, the parents argue that the appeal is not moot because the parents face the collateral consequence of being listed on the California Child Abuse Central Index (CACI) if the jurisdictional and dispositional findings are not reversed. Mother argues that the harm is not theoretical given that the Department admitted that it submitted the parents' names to CACI and mother lost her job as a behavioral aide as a result. We discuss below the

reasons we have determined that, based on the unique facts of this case, dismissal of this case is appropriate.[10]

The Department is required to "forward to the Department of Justice a report in writing of every case it investigates of known or suspected child abuse or severe neglect that is determined to be substantiated, other than cases coming within subdivision (b) of Section 11165.2."[11] (§ 11169, subd. (a).) The Department must notify a known or suspected child abuser in writing that he or she has been reported to CACI. (§ 11169, subd. (c).) A person listed on CACI generally has the right to a hearing before the agency that requested his or her inclusion to challenge the listing. (§ 11169, subd. (d).)

---

[10] The issue of whether an appeal of a juvenile court's jurisdictional orders is moot based on a parent's assertion that he or she may be barred from challenging a CACI listing is currently under review by the California Supreme Court. (*In re D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.], review granted May 26, 2021, S267429.)

[11] "[T]he term 'child abuse or neglect' includes physical injury or death inflicted by other than accidental means upon a child by another person, sexual abuse as defined in Section 11165.1, neglect as defined in Section 11165.2, the willful harming or injuring of a child or the endangering of the person or health of a child, as defined in Section 11165.3, and unlawful corporal punishment or injury as defined in Section 11165.4." (§ 11165.6.)

" 'Severe neglect' means the negligent failure of a person having the care or custody of a child to protect the child from severe malnutrition or medically diagnosed nonorganic failure to thrive [or] . . . those situations of neglect where any person having the care or custody of a child willfully causes or permits the person or health of the child to be placed in a situation such that his or her person or health is endangered, as proscribed by Section 11165.3, including the intentional failure to provide adequate food, clothing, shelter, or medical care." (§ 11165.2, subd. (a).)

Section 11165.2, subdivision (b), defines "general neglect" as "the negligent failure of a person having the care or custody or a child to provide adequate food, clothing, shelter, medical care, or supervision where no physical injury has occurred."

However, "[a] hearing requested pursuant to subdivision (d) shall be denied when a court of competent jurisdiction has determined that suspected child abuse or neglect has occurred[.]"  (§ 11169, subd. (e).)  The parents assert that a dismissal of their appeal will prevent them from requesting a hearing before the Department to challenge their inclusion on CACI.  We question this conclusion, but even if it is true, we find that the parents are not prejudiced based on the record in this case.

As discussed above, only cases which have been investigated and substantiated and which meet the statutory definition of "abuse" or "severe neglect" must be reported to CACI.  (§ 11169, subd. (a).)  Although the Department's disposition report mentions that mother "lost her job as a result of the investigation being sent to [CACI] as required by law," nothing in the record corroborates this statement nor explains why a referral to CACI would have been made in this case.  In the jurisdiction and disposition reports, the Department states that *none* of the four referrals regarding mother and father investigated by the Department, including, but not limited to the September 10, 2020, domestic violence incident referenced in the petition, were *substantiated.*  According to the Department, all of its investigations were *inconclusive*, a finding which need not be reported to the Department of Justice for inclusion in CACI.  Moreover, none of the Department's investigations revealed that any of the children were "abused" or "severely neglected," as defined in sections 11165.6 or 11165.2.  The trial court sustained an allegation based on "general neglect" as defined in section 11165.2, subdivision (b), a situation which is expressly exempted from the reporting requirement.  (§ 11169, subd. (a).)  In short, despite the social worker's brief reference in the disposition report, it does not appear that the parents' names should have been referred to CACI given that neither the

18

Department's investigations nor the trial court's finding met the statutory criteria for doing so. Neither the trial court record nor the record augmented on appeal contain evidence that a referral of either parent has actually been made, or that either parent has been notified of a CACI referral as required by section 11169, subdivision (c).

The factual basis for the conclusion that mother lost her job as an "In Home Supportive Services" employee due to a CACI referral is equally murky. The record reflects that mother sent Bartosch a text message on November 16, 2020, which accused the social worker of being "a liar," and pursuing a "bogus" case "to exploit my family for money for the state." Mother states in the text: "I lost my job as a behavioral aid [*sic*] because you opened a case against me." Mother did not present any evidence at jurisdiction or disposition about where she was employed prior to the Department's investigation, nor did she state when or how she was terminated from that job. It is also important to note that mother's unsworn statement about losing her job was made in the context of an acrimonious communication with the Department. On this record, the parents have not met their burden of demonstrating that either of them has suffered or will suffer adverse consequences under section 11169, subdivision (e) unless this court exercises its discretion to decide the merits of an otherwise moot appeal.

## DISPOSITION

The appeals are dismissed as moot.

_____
Mayfield, J.*


We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.


_In re B.K. et al._  (A162299)


* Judge of the Mendocino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.